UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x

CAMERON McELROY,                              :

               Plaintiffs,                    :

      -against-                                  :

GEMARK ALLOY REFINING CORPORATION, :

               Defendant.                     :
------------------------------------------------------------ x

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:
> DATE FILED: 11/24/08

07 Civ. 1375 (CSH)

MEMORANDUM OPINION
AND ORDER

HAIGHT, Senior District Judge:

        In this diversity action, plaintiff Cameron McElroy sues defendant Gemark Alloy

Refining Corporation ("Gemark") for breach of contract.[1]  Gemark now moves pursuant to

Fed.R.Civ.P. 56 for summary judgment dismissing McElroy's complaint.  For the reasons that

follow, the motion is granted and the complaint dismissed.

---

[1] The jurisdictional allegations in plaintiffs' complaint are insufficient. Plaintiff alleges
subject matter jurisdiction in this Court on the basis of diversity of citizenship. 28 U.S.C. §
1332. Plaintiff alleges that he is a "resident" of Rhode Island. Complaint ¶ 1. For diversity
purposes, citizenship depends upon domicile, not residence. An individual can have more than
one state of residence, but only one state of domicile. An allegation of residence only is legally
insufficient. Plaintiff further alleges that Gemark "is a domestic corporation" with "its principal
place of business in New York." *Id.* ¶ 2. For diversity purposes, a corporation is a citizen of
both the state of its incorporation and the state where it maintains its principal place of business.
A plaintiff should specifically allege the state of incorporation of a corporate defendant. While in
the ordinary course a complaint this deficient would be dismissed without prejudice to
repleading, the evidence submitted on the present motion indicates that diversity of citizenship
does in fact exist.

## I. BACKGROUND

### A. *Undisputed Facts*

While there has been no discovery in this case, the following undisputed facts are established by the documents submitted on the motion and the affidavits of individuals at the center of the controversy.

Gemark is in the business of recovering and refining precious metals from such varied sources as gold jewelry, sink sludges, and teeth, among many others. Its headquarters is in Newburgh, New York. Gemark, then called the Gemark Corporation, was founded in 1981. Mario Batelic served as the company's president and CEO from that time until his death in 2003. Mario Batelic's sons, Jack Batelic and Aaron Batelic, and his daughter, Trudy Batelic, are presently involved in the conduct of Gemark's business, which is run by the Batelic family.

Plaintiff Cameron McElroy met Mario Batelic in 1980, when they were both employees at Midland Processing, Inc. in Pomona, New York. In 1983, after its founding, Gemark hired McElroy as a chemist. In 1989, Batelic promoted McElroy to the position of plant manager. In 1996 McElroy resigned from Gemark and accepted employment with Pease and Cuuren, Inc., a Rhode Island company also in the business of recovering and refining precious metals from various sources.

In 2000, McElroy reestablished contacts with Mario Batelic. McElroy says in his affidavit ("McElroy Aff.") at ¶ 32 that in "July 2000 I met with Batelic and reviewed my business plan. I asked Batelic if he wanted to start a joint venture with me. The joint venture's business was dedicated to refining precious metals." The "business plan" McElroy refers to is apparently a 67-page document captioned "Recovery and Refining Business Plan," McElroy Aff. Ex. A, although it is dated July 4, 2001, which does not square with a meeting with Batelic in July 2000; however,

2

the discrepancy is not material. McElroy says: "September 3, 2000 Batelic and I met to discuss the joint venture." McElroy Aff. ¶ 44. That meeting is confirmed by a letter dated September 3, 2000 McElroy sent to Batelic, enclosing "a brief summary of the meeting" and stating that "we could use this list as an agenda to the next meeting in Newburgh." McElroy Aff. Ex. B. McElroy further states "October 2000 Batelic and I met to discuss the joint venture," McElroy Aff. ¶ 46, but the substance of that discussion is not described.

The meeting lying at the heart of the case occurred on February 23, 2001. It is undisputed that a meeting took place on that date at the offices of Drake, Sommers, Loeb, Tarshis & Catania, a law firm representing Gemark and the Batelic family. The meeting was attended by Mario Batelic, McElroy, and Steven L. Tarshis, an attorney and member of the firm. On October 31, 2000, in preparation for that meeting, McElroy's attorney, Joe Polumbo, drafted and e-mailed to Gemark's counsel "an outline of a joint venture agreement that was to be used for discussions involving the finalization of a contractual agreement between Batelic and myself." McElroy Aff. ¶ 48. The document is captioned "Joint Venture Agreement Outline" ("the Outline"). It is attached as Ex, D to McElroy's affidavit. A document with the same text but in different format is attached as Ex. C to the affidavit of Jack Batelic ("J. Batelic Aff."). The Outline contained some blanks to be filled in. The handwritten notations on Ex. C to Jack Batelic's affidavit make it clear that this was the document used as a worksheet by the participants during the February 23, 2001 meeting.

Also in preparation for that meeting, McElroy drafted a typed list captioned "Items for Contract" ("Contract Items"), McElroy Aff. Ex. C, which he described as "an outline to be discussed at the meeting with Batelic." *Id.* ¶ 47. The same document, with added handwritten notations, is attached as J. Batelic Aff. Ex. D, and described by Jack Batelic as "an itemization of points which

3

the plaintiff [McElroy] wanted to incorporate into the formal contracts." *Id.* ¶ 15. Again, the

handwritten notations indicate that this copy was one of the working documents at the meeting.

I will quote from the Outline, indicating in italics the handwritten notations. The Outline

begins with a paragraph captioned "Scope and Description." It reads:

> The parties desire to form a joint venture to reclaim and refine
> precious metals from dental scrap, jewelry scrap, and other scrap
> material. The joint venture will be conducted under the name
> *Gemark Alloy* _____ with a principal place of business at *to be*
> *determined.*

The next paragraph, captioned "Contributions," provides that "Mario will make a

capital contribution of not less than $ *to be determined* to the development of the joint venture," that

"Cameron will contribute his expertise and experience in the specialized nature of the business to

the joint venture," and that "[at] the conclusion of the 'start up period, as hereinafter defined, both

parties commit to execute personal guarantees of *as necessary* up to $ 1 million to support any

necessary borrowing or credit obligations of the business."

The next paragraph is captioned "Start Up Period." It provides:

> The "start up period" shall be defined as the period of time the
> parties agree as reasonably necessary to determine if the joint venture
> can support the acquisition of its own facility within reasonable
> commuting distance from Cameron's residence in Rhode Island,
> either on an ownership or lease basis, for the reclamation and refining
> of precious metals, after a diligent, good faith effort by the parties
> ("the benchmark"). If the benchmark is not reached within two years
> of the date hereof, this agreement shall be terminable at the option of
> either party.

4

The next paragraph, which I need not quote in full, provides that during the start up

period "Cameron will be employed full time as an employee of Gemark Corporation, a company

owned by Mario."

I will quote the next two paragraphs in full. The first is captioned "Operation of Joint

Venture." It provides:

> Once the benchmark is reached, *illegible handwritten words*, the
> joint venture shall become operational at a suitable facility to be
> located within reasonable commuting distance from Cameron's
> residence in Rhode Island. Cameron will thereupon leave his
> employment with Gemark and will become a full time employee of
> the joint venture business at a reasonable salary commensurate with
> his experience and duties. Mario agrees to provide adequate working
> capital to support the operation of the business, including an adequate
> sales force.

The next paragraph, " Title to Property/Division of Profits," provides:

> All property acquired by the joint venture, whether real or personal,
> shall be taken in the name of the joint venture business and held for
> the benefit of the parties, with Mario to have a 65% interest therein
> and Cameron to have a 35% interest therein.

> The net profits of the joint venture shall likewise be divided with
> Mario to receive 65% and Cameron to receive 35%.

A paragraph captioned "Death or Incapacity of a Party" provides:

> The death or incapacity of a party shall cause the joint venture to be
> terminable at the option of the other party as of the end of that current
> fiscal year. Thereupon, the assets and net profits of the business shall
> be distributed on a pro rata basis.

The "Contracts Item" document, drafted by McElroy, begins with the notation "I am

ready to combine stage 1 and 2." It is not clear what stages 1 and 2 are. Paragraph 1 of the

5

document states: "Two year duration. Hopefully the business will be fully operational much earlier than two years." Paragraph 9 provides: "Incorporation or agreement to Incorporate at the end of stage two."

Neither the Outline nor the Contract Items document was signed by either Mario Batelic or McElroy. Jack Batelic attaches to his affidavit as Exs. E, F, G and H four draft agreements, none of which was signed by either party.

Ex. E is a draft "Employment Agreement" between McElroy as the "Employee" and Gemark Corporation as the "Company"[2] as of an unspecified date in 2001 and continuing until an unspecified date in 2003.

Ex. F is a draft "Employment Agreement" between McElroy as the "Employee" and Gemark Alloy Refining Corp. as the "Company" as of September 1, 2005 and continuing until December 31, 2012.

Ex. G is a draft "Executive Stock Appreciation Agreement" between Genmark Alloy Refining Corp. and McElroy as the "Executive" as of an unspecified date in 2005. The second "Whereas" clause, as amended by the striking out of certain typed words and the apparent addition of other underlined words, recites that "Executive conducted certain oral discussions in or about February, 2001, with Mario Batelic, the President and sole shareholder of the Company, which terms Executive and Company wish to memorialize in a written agreement . . . . " This draft describes a Plan for vesting McElroy with 35% of the Company's common stock, and also provides that the Company's Board shall hold a meeting "for the purpose of establishing the Plan promptly upon

---

[2] It appears that in 2001, Gemark changed its corporate name from "Gemark Corporation" to "Gemark Alloy Refining Corp."

6

execution of this Agreement," and the Plan "shall become operative and in effect as of the Effective Date, after approval and authorization thereof by a vote of the holder of a majority of the outstanding Common Stock, which shall occur not later than March 31, 2005." The draft defines the "Effective Date" as January 1, 2005. This agreement was not signed by either party, the specified Board meeting was never held, and the Plan never became operative and in effect.

Ex. H is a draft "Executive Stock Appreciation Agreement" similar in form to Ex. G. The dates are puzzling: While the preamble states that the Agreement is made as of an unspecified date in March 2006, the Definitions section defines the "Effective Date" as September 1, 2005. Again, the establishment of the Plan required a meeting of the Board for that purpose and the affirmative vote of a majority of the common stockholders; again, neither event took place.

While the authors of these documents are not specifically identified, it is clear from the record that Gemark's officers and advisers drafted Exs. E, F, G and H. Jack Batelic describes them as "multiple drafts and revisions of proposed employment agreements and executive stock appreciation agreements," and says: "*We* tried to incorporate the initial discussions back in 2001 into some acceptable legal format. It never happened." J. Batelic Aff. ¶ 14 (emphasis added). The only reasonable inference to be drawn is that Gemark proposed these drafts to McElroy and McElroy rejected them. That inference is reinforced by the fact that, unlike the Joint Venture Agreement Outline" McElroy's attorney drafted and sent to Gemark's attorney, McElroy did not attach any of these documents as exhibits to his own affidavit, with the exception of a copy of Ex. E, the draft 2001 Employment Agreement, which as discussed *infra* McElroy illicitly obtained from Gemark's files.

7

On April 2, 2001 McElroy returned to Gemark's employ in a managerial capacity. Gemark terminated McElroy's employment on September 11, 2006. This action followed.

## B. *Plaintiff's Theory of the Case.*

The complaint alleges that in February 2001, Mario Batelic on behalf of Gemark entered into a binding contract with McElroy which it breached when Gemark terminated him in 2006 and failed to vest McElroy with a 35% interest in Gemark Alloy Refining Corp. As summarized in plaintiff's brief at (unnumbered) page 6, "plaintiff alleges the Batelic and McElroy's joint venture was created by oral agreement February 23, 2001." Stated otherwise, plaintiff's theory is that "Batelic and McElroy orally agreed to start a joint venture wherein Batelic and Mcelroy would be joint owners of the joint venture," and "the parties unequivocally orally communicated their desire to form a joint venture when they met February 23, 2001." *Id.* at pages 4, 5.

These assertions are based upon ¶¶ 32-75 of McElroy's affidavit in opposition to Gemark's motion for summary judgment. Those paragraphs are preceded by the caption "Joint Venture with Batelic Created by Oral Contract." What follows are quotations from certain of those paragraphs in McElroy's affidavit.

> July 2000 I met with Batelic and reviewed my business plan. I asked Batelic if he wanted to start a joint venture with me. The joint venture's business was dedicated to refining precious metals. Batelic told me that he would agree to my owing [*sic*] thirty five (35%) percent of the joint venture once a financial benchmark, i.e. gross revenues of five million ($5,000,000) dollars per annum was reached. Batelic would own sixty five (65%) of the joint venture once the financial benchmark was attained.

> I informed Batelic that my preference was that the joint venture be built in Rhode Island. My family resided in Rhode Island. Batelic informed me the facility would be built in Rhode Island once the above described financial benchmark was attained. Batelic's son,

8

Aaron Batelic visited me in Rhode Island.  We discussed locations where the joint venture could be sited.  I contacted real estate agents and toured industrial sites.  Batelic determined the joint venture business had to be based initially in the Newburgh, New York [*sic*].  Money was to be saved by starting the joint venture in Newburgh, New York.

Batelic asked me how long I estimated it would take for the joint venture to generate gross revenues of five million ($5,000,000.00) dollars.  I told Batelic that the five million ($5,000,000.00) dollars gross annual revenue could be reached in less than one (1) year if the joint venture was properly funded.  I told Batelic salespersons had to be hired to generate the projected annual gross revenue.

Batelic and I agreed, the five million ($5,000,000.00) dollar benchmark would serve two (2) purposes.  Once attained, my thirty five (35%) percent ownership in the joint venture would vest.  Said benchmark, once attained would justify building a facility in Rhode Island.

September 3, 2000 Batelic and I met to discuss the joint venture.  Subsequent to the meeting, I forwarded Batelic a letter regarding the September 3, 2000 meeting.  See Exhibit "B".  October 2000 Batelic and I met to discuss the joint venture.  Prior to October 2000 meeting, I drafted an outline to be discussed at the meeting with Batelic.  See Exhibit "C".  On October 31, 2000 my counsel, Joe Polumbo drafted an outline of a joint venture agreement that was to be used for discussions involving the finalization of a contractual agreement between Batelic and myself.  A copy of the outline was forwarded to Batelic's counsel Steve Tarshis.  See Exhibit "D".

The outline was used as a worksheet at a meeting I attended with Batelic and his counsel February 23, 2001 wherein Batelic and I orally contracted to form a joint venture.  February 23, 2001 I was on vacation.  I spoke with Batelic on the telephone and informed Batelic I needed to meet with him to finalize our joint venture contractual agreement.    Batelic informed me that if I arrived at Gemark Corporation by 6:00 p.m. we would meet at Batelic's counsel's office to finalize the joint venture agreement.  I drove the family van to

9

Newburgh, New York arriving on time. Batelic, Steve Tarshis and I met at the Law Offices of Drake, Sommers, Loeb, Tarshis & Catania, PLLC.

We discussed the joint venture terms. Mr. Tarshis stated that we needed to incorporate at the inception of the joint venture. Batelic and I agreed that I would own thirty five (35%) percent of the joint venture once the joint venture generated five million ($5,000,000.00) dollars in annual gross revenues financial benchmark was attained. Batelic and I agreed that I would sit on the Board of Directors of the joint venture. Batelic informed me that I would be paid less than I was entitled, i.e. sixty five thousand ($65,000.00) per annum so as to assist in the funding of the joint venture. Batelic and I agreed I would be paid sixty five thousand ($65,000) dollars per annum. Batelic and I agreed that Batelic would fund the joint venture and construct the facility. Batelic and I agreed that I would supply my technical expertise and industry contacts. Batelic and I agreed that if the joint venture did not reach the above cited benchmark within two (2) years either Batelic or I had the option of ending the joint venture. It was possible to attain the five million ($5,000,000.00) dollar gross revenues within one (1) year of the start of the venture, i.e. February 23, 2001. Batelic and I shook hands at the conclusion of the meeting welcoming each other as partners to the joint venture.

My preference was that Batelic and I had executed a written contract February 23, 2001. I concluded it was important to finalize orally with Batelic the terms of the joint agreement. I was comfortable entering into an oral agreement with Batelic believing Batelic to be a man whose words could be trusted. Mr. Tarshis ended the meeting by saying "Mario is a man of honor and will honor this agreement." Batelic and I never renegotiated the terms of our joint venture.

On January 2003 [sic] Batelic died of a heart attack in Italy. February 2003 I determined my oral agreement with Batelic should be documented. I was comfortable operating in accordance with the oral agreement having worked with Batelic for years. I did not have the same comfort level regarding Batelic's sons, Jack Batelic and Aaron Batelic honoring Batelic's word. I asked Jack Batelic and Aaron Batelic assistance [sic] in scheduling a meeting with Batelic's counsel Steve Tarshis and my counsel. Jack Batelic and Aaron Batelic informed me that documenting my oral agreement with Batelic was not a priority item. I told Jack Batelic and Aaron Batelic

10

> that it was imperative that a written agreement consistent with the
> oral agreement I entered into with Batelic be fully executed.

It is undisputed that a written agreement signed by the parties was never executed.

McElroy continued to work at Gemark. On September 11, 2006, McElroy and his business

consultant, Wayne Day, met with Jack Batelic and Marty Goldstein, the Batelic family's business

consultant. Goldstein told McElroy that he "was no longer a partner" and that his employment by

Gemark was terminated. McElroy Aff. ¶¶ 151-155.

## C. *Defendant's Theory of the Case.*

Gemark contends principally that at all relevant times McElroy was an at-will employee

of Gemark, and that any conversations between McElroy and Mario Batelic did not create an

obligation binding upon Gemark. Jack Batelic says in his affidavit at ¶¶ 12-13:

> From the inception, my father [Mario Batelic] was leery of conveying
> any interest in Gemark to the plaintiff. For that very reason, we were
> agreeable to discuss ideas and business expansion visions, but
> Gemark never formalized an employment agreement or an executive
> stock appreciation agreement with Cameron McElroy. Neither my
> father nor anyone else at Gemark ever entered into a joint venture
> agreement with this plaintiff. Despite diligent negotiations, that
> concept never made it off the drawing board. . . . We considered only
> the possible execution of a future agreement. That never happened
> and the plaintiff therefore continued as an at will employee without
> any type of employment agreement.

Gemark also contends that the putative oral agreement is barred by the Statute of Frauds.

Gemark moves for summary judgment.

11

## II. DISCUSSION

### A. *Standard of Review.*

Summary judgment should be granted if the moving party shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56©.

The substantive law governing the case will identify which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' *Anderson v. Liberty Lobby, Inc.*, 417 U.S. 242, 248 (1986). New York law governs the present case.

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir.1995). In determining whether a genuine issue of material fact exists, a court views the facts in the light most favorable to the non-moving party, here McElroy, resolves all ambiguities in his favor, and draws all reasonable inferences against the moving party, here Gemark. *See, e.g., Singh v. City of New York*, 524 F.3d 361, 366 (2008); *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir.2004).

However, "mere conclusory allegations, speculation or conjecture" are insufficient for a non-moving party to resist summary judgment. *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary

12

judgment is proper." *Gallo v. Prudential Residential Services, Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

"Because this case involves enforcement of an alleged contract, the intentions of the parties are at issue. While this is frequently a source of persistent disputes of fact, where a question of intention is determinable by written agreements, the question is one of law, appropriately decided on a motion for summary judgment." *Brown v. Caro*, 420 F.3d 148, 153 (2d Cir.2005 (citation, internal quotation marks, and brackets omitted).

## B. Questions Presented by Defendant's Motion for Summary Judgment.

Defendant's motion raises two related but separate questions: (1) Did the parties agree to be bound by an oral contract? (2) If they did so agree, does the Statute of Frauds render that contract unenforceable? I consider these questions in turn.

### 1. Did the Parties Agree to be Bound by an Oral Contract?

The jurisprudence of contracts is replete with cases where, after negotiations and discussions take place between parties, and drafts or other documents are exchanged, the parties dispute whether binding obligations were thereby created. Such cases turn, as does the case at bar, upon whether the evidence shows that the parties intended to be bound by their preliminary exchanges.

In some cases, the decisive question is whether a preliminary agreement creates a binding contract. District Judge Leval (as he then was) considered such agreements in his seminal opinion in *Teachers Insurance and Annuity Association of America v. Tribune Company*, 670 F.Supp. 491 (S.D.N.Y. 1987); *see also Network Enterprises, Inc. v. APBA Offshore Productions, Inc.*, 427 F.Supp. 463 (S.D.N.Y. 2006) (collecting cases), *aff'd*, 264 Fed.Appx. 36 (2d cir. Feb. 11, 2008). In *Adjustrite Systems, Inc. v. GAB Business Svcs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998), one of the unbroken line

13

of Second Circuit cases approving and applying Judge Leval's analysis in *Teachers Insurance*, the Court of Appeals said: "Ordinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract." *Adjustrite Systems, Inc. v. GAB Bus. Svcs., Inc.*, 145 F.3d 543, 548 (2d Cir.1998). "In some circumstances, however, preliminary agreements can create binding obligations." *Adjustrite*, 145 F.3d at 548. The extent of the binding obligations thus created depends on the preliminary agreement in question, which Second Circuit jurisprudence divides into two types.    Type I preliminary agreements reflect a meeting of the minds on all the issues perceived to require negotiation, thereby binding both sides to their ultimate contractual objective.  Type II preliminary agreements reflect agreement on certain  major terms but leave others open for further negotiation. These agreements do not commit the parties to their ultimate contractual objective, but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the objective within the agreed framework. *See Brown v. Caro*, 420 F.3d at 153.

However, I do not think these questions arise in the case at bar because McElroy's theory, as I understand it, is not that his oral exchanges with Mario Batelic resulted in a *preliminary* agreement of any type or kind.  Rather, McElroy contends that his discussions with Mario Batelic, Gemark's president, resulted in a binding and enforceable oral contract between himself and Gemark.[3] McElroy acknowledges that the parties contemplated a subsequent written agreement; he cannot do otherwise, having retained counsel to draft the Joint Venture Agreement Outline in preparation for

---

[3] In *Teachers Insurance*, Judge Leval distinguished between "a determination whether final contracts had been reached in preliminary form" and the "different inquiry" of "whether preliminary commitments are to be considered binding." 670 F.Supp. at 498-99. *Teachers Insurance* fell within the second of these two categories. The case at bar falls within the first.

the February 23, 2001 meeting. But he cites New York law for the proposition that the parties' failure

to execute a written agreement does not bar his breach of contract claim.

>    In *Ciamarella v. Reader's Digest Assn., Inc.*, 131 F.3d 320, 322 (2d Cir.1997), the

Second Circuit held:

>    Under New York law, parties are free to bind themselves orally, and
>    the fact that they contemplate later memorializing their agreement in
>    an executed document will not prevent them from being bound by the
>    oral agreement. However, if the parties intend not to be bound until
>    the agreement is set forth in writing and signed, they will not be
>    bound until then. The intention of the parties on this issue is a
>    question of fact, to be determined by examination of the totality of the
>    circumstances.

(citations omitted). *Ciamarella* cited *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80-81

(2d Cir.1986), in which the Second Circuit said at greater length:

>    Under New York law, parties are free to enter into a binding contract
>    without memorializing their agreement in a fully executed document.
>    This freedom to contract orally remains even if the parties
>    contemplate a writing to evidence their agreement. In such a case, the
>    mere intention to commit the agreement to writing will not prevent
>    contract formation prior to execution. On the other hand, if either
>    party communicates an intent not to be bound until he achieves a fully
>    executed document, no amount of negotiation or oral agreement to
>    specific terms will result in the formation of a binding contract.
>    Because this freedom to determine the exact point at which an
>    agreement becomes binding, a party can negotiate candidly, secure in
>    the knowledge that he will not be bound until execution of what both
>    parties consider to be the final document.
>
>    In any given case it is the intent of the parties that will determine the
>    time of contract formation. To discern that intent a court must look
>    to the words and deeds of the parties which constitute objective signs
>    in a given set of circumstances. . . . These circumstances may be
>    shown by oral testimony or by correspondence or other preliminary
>    or partially complete writings.

(citations and internal quotation marks omitted).

*Winston* articulates several factors the court should consider to help determine whether the parties intended to be bound in the absence of a document executed by both sides: "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged agreement have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." 777 F.2d at 80.

*Winston* and *Ciamarella* continue as Second Circuit precedent. *See Omega Engineering, Inc. v. Omega, S.A.*, 432 F.3d 437, 444 (2d Cir.2005) ("[T]he four common law factors we identified in *Ciamarella* and *Winston* . . . ordinarily guide our inquiry into whether parties intend to be bound in the absence of an executed writing . . .") (applying similar factors derived from Connecticut cases to an agreement settling litigation).

In the case at bar, I accept for summary judgment purposes the account McElroy gives in his affidavit of his discussions with Mario Batelic. This is what McElroy would testify to at trial if Gemark's motion for summary disposition fails. It follows that I accept that McElroy (a) intended his discussions with Mario Batelic to result in an oral contract binding on both parties, and (b) believes that such a contract was entered into. Hence this action for breach of contract, notwithstanding the absence of an executed writing.

However, *McElroy's* intention and belief do not control. There is no contract to support this action "if *either* party communicates an intent not to be bound until he achieves a fully executed document," because "in that circumstance no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract." *Winston*, 777 F.2d at 80 (emphasis added). Thus the case turns upon whether the record demonstrates a genuine issue as to the material fact of

16

*Gemark's* intention to be bound to a contract with McElroy. Phrased differently, the question is whether a "rational jury could find" that Gemark intended to be bound by an oral contract with McElroy. *Gallo*, 22 F.3d at 1224.

I conclude that no rational jury could make that finding. The record clearly establishes that there is no genuine issue about the material fact of intention. Gemark's consistent intention was to be bound only by a fully executed written agreement with McElroy. That intention is evidenced by the fact that the February 21, 2001 meeting, where McElroy's written outline and contract points were considered, did not result in a signed agreement. It is further evidenced by the subsequent draft agreements Gemark proposed to McElroy during his renewed employment at the company. For example, the Executive Stock Appreciation Agreement drafted by Gemark, J. Batelic Aff. Ex. G, recites that McElroy and Mario Batelic "conducted certain oral discussions in or about February, 2001" which terms the parties "wish to memorialize in a written agreement." Whatever McElroy's intentions or beliefs, this language proposed by Gemark makes it plain that the company would not consider itself bound until the both parties signed a contract along the lines of Ex. G. That conclusion is consistent with and supported by the further provisions in Ex. G that the contract's "Effective Date" was January 1, 2005, and that McElroy would not be vested with 35% of Gemark's common stock until the Board held a special meeting and a majority of the company's shareholders approved the Plan called for by the agreement. This record satisfies the first *Winston* factor, namely, "an express reservation" on Gemark's part "of the right not to be bound in the absence of a writing." While that reservation was not stated by Gemark in those precise words, *Ciamarella* instructs that the intention of the parties on this issue must "be determined by examination of the totality of the circumstances." 131 F.3d at 322. In this case, the nature and content of the agreements Gemark

drafted are circumstances which manifest Gemark's intent to achieve a written contract with McElroy before McElroy's status was changed from that of an employee at will to that of a partner in a joint venture.

The second *Winston* factor asks whether a plaintiff suing upon an oral contract has partially performed it. The reasoning is that the plaintiff would not have expended such efforts if he did not have a binding contract with the defendant. That factor does not arise in the case at bar because all McElroy's activities on Gemark's behalf, which he recounts at length in his motion papers, are equally consistent with his duties as an employee. *Cf. Anostario v. Vicinanzo*, 59 N.Y.2d 662, 664 (Ct. App.1983) (in Statute of Frauds context, "[t]he doctrine of part performance may be invoked only if plaintiff's actions can be characterized as unequivocally referable to the agreement alleged.") (Internal quotation marks omitted).

The third *Winston* factor asks if all of the terms of the alleged agreement have been agreed upon. That this inquiry must be answered in the negative appears clearly enough from McElroy's draft Joint Venture Agreement Outline, with its handwritten notations of "to be determined" in the spaces provided for substantive provisions. There is no evidence that agreement binding on both parties was subsequently reached with respect to them. Moreover, McElroy does not challenge Gemark's assertion that it presented draft agreement containing many substantive terms to McElroy and McElroy did not sign off on any of them. In these circumstances, McElroy cannot be heard to say that he and Gemark had agreed on all the terms of the alleged agreement.

The fourth *Winston* factor asks if the agreement at issue is the type of contract that is usually committed to writing. While there is no evidence in the record of custom or usage, the nature of the transaction at issue favors Gemark. The contract that McElroy alleges would give him a 35%

interest in a contemplated multi-million dollar venture with activities extending over a number of years. The magnitude and complexity of the proposed joint venture are sufficient to "reflect a practical business need to record all the parties' commitments in definitive documents." *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262-63 (2d Cir.1984). *See also Winston*, 77 F.2d at 83 (while the transaction was not as complex as that in *Reprosystem*, "the $62,500 at issue is not a trifling amount, and payment was to be made over several years based on a percentage of earnings. . . . [T]he parties evidently thought the terms and language used were complex enough to require substantial redrafting."); *Henchman's Leasing Corp. v. Condren*, No. 87 Civ. 6478, 1989 WL 11440 (S.D.N.Y. Feb. 8, 1989) (*Leval, J.*) (action to enforce an alleged contract for the sale of an aircraft; "[t]he varieties and complexities of possible terms and the potential importance of the interests at stake in such terms are sufficient to make it likely that professional dealers in this area will employ detailed, formally executed contracts, rather than summary letters similar to that of August 11.").

One must recognize, of course, that factors such as the four articulated in *Winston* are "not determinative but are merely suggestive by the Court of Appeals for the light they may shed on the contractual intent." *Henchman's Leasing Corp.*, 1989 WL 11440, at * 7. In *R.G. Group v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir.1984), the Second Circuit said:

> The point of these rules is to give parties the power to contract as they please, so that they may, if they like, bind themselves orally or by informal letters, or that they may maintain complete immunity from all obligation until a written agreement is executed.

(citation and internal quotation marks omitted). However, application of the *Winston* factors to the case at bar compels the conclusion that in the absence of an executed written agreement, no contract existed between McElroy and Gemark, a conclusion "supported by the writings and acts of the

19

parties, by the language of the drafts of the agreement, and by the nature of the agreement itself."

*Winston*, 777 F.2d at 83. No rational jury could reach a contrary conclusion.

Accordingly, Gemark is entitled to summary judgment.[4]

## 2. If the Parties Agreed Upon an Oral Contract, Does the Statute of Frauds Render that Contract Unenforceable?

In Part II.B.1., I concluded that the parties did not enter into a binding oral agreement.

That conclusion entitles Gemark to summary judgment and moots the second question, namely,

whether a contract agreed upon by the parties would nonetheless be unenforceable under the New

York statute of frauds. However, for the sake of a complete analysis I will address that question.

The New York statute of frauds is codified in Article 5 of the New York General

Obligations Law. N.Y. Gen.Oblig.Law § 5-701(a) provides:

> Every agreement, promise or undertaking is void, unless it or some
> note or memorandum thereof be in writing, and subscribed by the
> party to be charged therewith, or by his lawful agent, if such
> agreement, promise or undertaking:
> 1. By its terms is not to be performed within one year from the
> making thereof. . . .

Gemark argues that this provision voids the purported agreement McElroy sues to

enforce because "even from the inception, the plaintiff required a two-year start-up period before a

formal joint venture would even be formed or memorialized through written contracts." Reply brief

---

[4] McElroy argues that Gemark's motion for summary judgement is premature and should
not be entertained until a number of designated individuals, including Steven Tarshis, Gemark's
attorney, have been deposed. I do not agree. Some of these individuals are not in a position to
say anything probative on the decisive issues. If Tarshis were an essential fact witness, the
Canons of Ethics would mandate his disqualification and that of his firm. But these questions do
not arise because the Court's decision granting Gemark summary judgment does not depend
upon any disputed issues of fact. Rather, the decision proceeds from undisputed facts and
documents of unquestioned authenticity and provenance.

at 7. Gemark relies for that proposition on the "Start Up Period" paragraph in the Outline drafted by McElroy's attorney, quoted in Part I.A. Gemark also points to provisions in the subsequent drafts prepared by Gemark and presented to McElroy which "contemplated a long-term realtionship between Gemark and the plaintiff." *Id.*

McElroy contends that "the statute of frauds is generally inapplicable to a joint venture." Brief at (unnumbered) pages 15-16. That broad contention is not sustainable. In *Ebker v. Tan Jay International, Ltd.*, 739 F.2d 812, 827 (2d Cir. 1984), construing New York law, Judge Friendly wrote:

> Despite some sweeping pronouncements to the effect that the New York statute of frauds, N.Y.Gen.Oblig.Law § 5-701(a)(1), does not apply to joint ventures, these must mean only that a writing is not required simply because the transaction is a joint venture, and the statute must apply to joint ventures having a stated term of more than one year, as the plain language of § 5-701(a)(1) of the New York General Obligations Law dicates. A contract forming a partnership to be continued beyond one year, is within the statute of frauds. The inapplicability of the statute of frauds to joint venture agreements does not protect transactions that are otherwise subject to the statute. We perceive no difference relevant for the purpose of the statute of frauds between joint ventures for a stated term and partnerships for a stated term. The statements that the New York statute of frauds does not apply to joint ventures doubtless arise from the fact that joint ventures are usually not for a stated term but for a stated purpose, and the implicit assumption that, however unlikely, this purpose could be achieved within one year.

(citatations, internal quoation marks, ellipses, and footnote omitted).

At this point in his characteristically trenchant opinion, Judge Friendly dropped footnote 19, which reads in part:

> We accept that if Ebker [the plaintiff] had testified to a joint venture that would continue until the "Nancy Ebker Company" had achieved

21

> a particular level of profitability, at which time the venture would be sold, or until the time was ripe for it to go public, this would avoid the barrier of § 5-701(a)(1) of the New York General Obligations Law, since in theory, however unlikely in fact, the level could have been reached within a year.

These analyses in *Ebker* furnish guidance in the case at bar, in manners that I will discuss infra. But two preliminary points must be noted.

First, Gemark's brief misdescribes the "Start Up Period" paragraph in McElroy's Outline. Contrary to Gemark's contention, that paragraph did not *require* a two-year start-up period before the joint venture would be formed. Instead, it contemplated a period of time for determination of the joint venrure's economic viability, and provided that "[i]f the benchmark is not reached within two years of the date hereof, this agreement shall be terminable at the option of either party." McElroy's drafts are not clear on the point, but resolving all ambiguities in his favor on this summary judgment motion, I conclude that the "benchmark" referred to in the Outline is the "benchmark" McElroy refers to in his affidavit describing his discussions with Mario Batelic, namely, reaching a gross annual revenue of $ 5 million. McElroy says that this amount could be reached in less than one year if the venture was properly funded. There are also indications in McElroy's account of his discussions with Mario Batelic and Gemark's attorney, as well as in McElroy's Contract Item document list, that the enterprise would be incorporated if the joint venture achieved the benchmark level of profitability. To be sure, other provisions in McElroy's drafts are more consistent with the joint venture continuing as an entity for a term of years, but the most that can be said is that McElroy's drafts are ambigious on the point, and again, on Gemark's motion for summary judgment I resolve any ambiguities in McElroy's favor. These considerations bring the

22

case within Judge Friendly's reasoning in footnote 19 to his opinion for the Second Circuit in Ebker, and serve to take this case out of the statute of frauds.

Second, I pay no attention for statute of frauds analysis to the provisions in Gemark's draft agreements whch McElroy did not sign. Gemark engages in bootstrapping when it argues that McElroy's contemplation of the contract included provisions Gemark drafted to which McElroy did not agree. Gemark's drafts are probative of its intention to be bound, as discussed in Part II.A.1., but play no part in determining the applicability of the statute of frauds

I hold that if, contrary to the conclusion reached in Part II.A.1. that Gemark is under no contractual obligation to McElroy, Gemark's obligation would not be barred by New York Gen.Oblig.Law § 5-701(a)(1).

## III. CONCLUSION

For the foregoing reasons, Gemark's motion for summary judgment is GRANTED.

The Clerk of the Court is directed to dismiss the plaintiff's complaint with prejudice.[5]

---

[5] In formulating this opinion, I have given no consideration to a group of documents McElroy attached to his affidavit as Ex. K. This exhibit includes documents prepared by Steven Tarshis, Gemark's attorney, for the attention of his client. They are cited prominently in McElroy's affidavit in opposition to Gemark's motion, and in his counsel's brief in opposition. These documents are manifestly covered by the attorney-client privilege and intended by Mr. Tarshis for his client to consider in confidence. It is unlikely that an experienced businessman would be ignorant of the attorney-client privilege and what it entails. Certainly no practicing attorney could be. The record compels the inference that McElroy, in breach of his fiduciary duty to Gemark as his employer, looted Gemark's confidential files to obtain these doucuments for his own benefit before he was terminated. Equally problematic is the decision of his attorney to include copies of these privileged documents in public filings.

IT IS SO ORDERED.

Dated:  New York, New York
        November 24, 2008

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE

24